**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**MEDFORD DIVISION**

**FRED MARTI and LINDA MARTI,**

Plaintiffs,

v. Case No. 1:21-cv-00471-AA

**U.S. PRO MOVING AND LOGISTICS, LLC;**
**SOUTHEAST HOLDING LLC**; et al.,

Defendants,

# PLAINTIFFS' MOTION, MEMORANDUM AND STATEMENT OF FACTS FOR SUMMARY JUDGMENT AGAINST DEFENDANT SOUTHEAST HOLDING LLC

Thad M. Guyer
T.M. Guyer and Ayers & Friends, PC
116 Mistletoe Street
Medford, OR 97501
Telephone: (202) 227-3590
thad@guyerayers.com

Attorneys for Plaintiffs

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………………5

CERTIFICATE OF CONFERRING WITH ADVERSE COUNSEL…………………………9

MOTION FOR SUMMARY JUDGMENT………………………………………………... 10

MEMORANDUM OF LAW ........................................................................................11

I. INTRODUCTION AND INCORPORATION ..............................................................11

II. PROCEDURAL HISTORY .........................................................................................11

III. EFFECT OF PRIOR RULE 12 DISMISSAL OF RICE ................................................12

IV. INDEX OF PARTIES, WITNESSES AND ENTITIES..................................................12

V. PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS .......................16

A. Enterprise Origins and Early Consolidation ........................................................ 16

B. Formation of Southeast Holdings and Enterprise Structure ................................... 17

C. Operations, Workforce, and Continuity into Millennium...................................... 18

1. Division of Roles and Management Structure .................................................. 18

2. Carrier Relationships, Complaints, and Claims Handling ................................. 18

3. Rice's Control of Legal Functions Through Brickel .......................................... 18

4. Rice's Non-Transparent Financial Benefiting from the Enterprise ..................... 19

5. Rice's Control of Enterprise Records ................................................................. 19

D. The Marti Contract and Experience ...................................................................... 20

E. Website Deception and Complaints to U.S. Pro .................................................... 21

F. Coordinated Fraudulent Enterprise ........................................................................ 22

G. Monetary and Emotional Damages........................................................................ 23

H. Florida Attorney General Complaint AND CONSENT JUDGMENT..................... 24

I. Damages to the Plaintiffs Fred and Linda Marti:.................................................... 28

J. Listing of Damages Appendix: .......... 30

**SECTION A. FEDERAL CLAIMS**

VI. LEGAL STANDARD UNDER RULE 56 .......... 31

VII. UNDISPUTED FACTS SUPPORT SUMMARY JUDGMENT UNDER RICO .......... 31

A. Civil RICO Liability Under 18 U.S.C. § 1962(c) .......... 31

B. Rice's Conduct and Participation .......... 32

C. Authorization of Fraudulent Claims Processing .......... 33

D. Control over Record Retention and Concealment .......... 33

E. Evidence of Direction Across the Enterprise .......... 33

VIII. SOUTHEAST HOLDING'S DIRECT CONNECTION TO PREDICATE ACTS .......... 33

A. Existence of an Enterprise .......... 34

B. Pattern of Racketeering Activity .......... 34

C. Non-Fraud Predicate Acts .......... 35

D. Continuity and Threat of Ongoing Activity .......... 35

IX. RICE'S KNOWING PARTICIPATION .......... 36

E. Scienter and Causation .......... 37

X. CAUSATION: RICO'S PROXIMATE CAUSE OF PLAINTIFFS' INJURIES .......... 37

A. Proximate Cause Under Ninth Circuit Precedent .......... 38

B. The Directness of the Injury .......... 38

XI. USE OF THE FLORIDA ATTORNEY GENERAL'S COMPLAINT AND CONSENT JUDGMENTS AS COMPETENT EVIDENCE .......... 38

**SECTION B. STATE CLAIMS**

XII. NEGLIGENT SELECTION, HIRING, AND RETENTION .......... 39

A. The Governing Law in Each Interested State Supports the Claim .......... 39

B. The Undisputed Record Establishes Knowledge, Breach, and Causation .......... 40

C. Neither FAAAA Nor Carmack Erases the Independent Personal-Injury Claim .......... 41

XIII. CONVERSION ....43

A. The Undisputed Facts Establish Conversion Under Oregon, California, or Florida Law 43

B. Carmack and FAAAA Do Not Bar the Narrow Conversion Theory; Alternatively, the Facts Defeat Any Liability Limitation .... 44

XIV. CONCLUSION AND PRAYER ....45

CERTIFICATE OF COMPLIANCE ....47

CERTIFICATE OF SERVICE ....48

## TABLE OF AUTHORITIES

***Cases***

Allwaste, Inc. v. Hecht, 65 F.3d 1523 (9th Cir. 1995) ........ 35

Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006) ........ 37

Aspen American Insurance Co. v. Landstar Ranger, Inc., 65 F.4th 1261 (11th Cir. 2023) ........ 42

Bank of New York v. Fremont General Corp., 523 F.3d 902, 914 (9th Cir. 2008) ........ 43

Boyle v. United States, 556 U.S. 938 (2009) ........ 32, 34

Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008) ........ 37

Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158 (2001) ........ 31

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........ 31

Dan's City Used Cars, Inc. v. Pelkey, 569 U.S. 251 (2013) ........ 42, 44

Davies v. Commercial Metals Co., 46 So. 3d 71, 73-74 (Fla. Dist. Ct. App. 2010) ........ 40, 41

Dent v. National Football League, 902 F.3d 1109 (9th Cir. 2018) ........ 40

Fraser v. Goodale, 342 F.3d 1032 (9th Cir. 2003) ........ 39

Glickfeld v. Howard Van Lines, Inc., 213 F.2d 723 (9th Cir. 1954) ........ 45

H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989) ........ 32, 34, 35, 36

Hall v. North American Van Lines, Inc., 476 F.3d 683 (9th Cir. 2007) ........ 44

Handeen v. Lemaire, 112 F.3d 1339 (8th Cir. 1997) ........ 33

Harmoni Int'l Spice, Inc. v. Hume, 914 F.3d 648 (9th Cir. 2019) ........ 38

Holmes v. Securities Investor Protection Corp., 503 U.S. 258 (1992) ........ 38

Howard v. America Online Inc., 208 F.3d 741 (9th Cir. 2000) ........ 36

JL Beverage Co., LLC v. Jim Beam Brands Co., 828 F.3d 1098 (9th Cir. 2016) ........ 39

Just Film, Inc. v. Buono, 847 F.3d 1108 (9th Cir. 2017) ........ 37

Living Designs, Inc. v. E.I. DuPont de Nemours & Co., 431 F.3d 353 (9th Cir. 2005) ........ 38

Luben Industries, Inc. v. United States, 707 F.2d 1037 (9th Cir. 1983) ..... 12

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ..... 31

Medical Marijuana, Inc. v. Horn, 604 U.S. 593 (2025) ..... 38

Miller v. C.H. Robinson Worldwide, Inc., 976 F.3d 1016 (9th Cir. 2020) ..... 42

Montgomery v. Caribe Transport II, LLC, 608 U.S. 219, 146 S. Ct. 1199 (2026) ..... 42

Mtelehealth, LLC v. United Parcel Service, Inc., 441 F. Supp. 3d 1312 (S.D. Fla. 2019) ..... 44

Napoli v. United States, 32 F.3d 31 (2d Cir. 1994), adhered to on reh'g, 45 F.3d 680 (2d Cir. 1995) ..... 33

Navarro v. Block, 250 F.3d 729 (9th Cir. 2001) ..... 12

Odom v. Microsoft Corp., 486 F.3d 541 (9th Cir. 2007) ..... 34

Oki Semiconductor Co. v. Wells Fargo Bank, National Association, 298 F.3d 768, 777 (9th Cir. 2002) ..... 36, 40

Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co., 943 F.3d 1243 (9th Cir. 2019) ..... 38

Reves v. Ernst & Young, 507 U.S. 170 (1993) ..... 31, 32, 33

Rowland v. California Men's Colony, 506 U.S. 194 (1993) ..... 11

Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729 (9th Cir. 1987) ..... 12

Salinas v. United States, 522 U.S. 52 (1997) ..... 36

Schmuck v. United States, 489 U.S. 705 (1989) ..... 35

Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985) ..... 31

Senfeld v. Bank of Nova Scotia Trust Co., 450 So. 2d 1157 (Fla. Dist. Ct. App. 1984) ..... 43

Senger v. United States, 103 F.3d 1437, 1441–43 (9th Cir. 1996) ..... 40

Smith v. Berg, 247 F.3d 532 (3d Cir. 2001) ..... 36

Soremekun v. Thrifty Payless, Inc., 509 F.3d 978 (9th Cir. 2007) ........ 31

Thompson v. Inman, No. 6:22-cv-01665, ECF No. 87 (D. Or. May 9, 2024) (Kasubhai, M.J.) (unpublished) ........ 43, 44

United States v. Busacca, 936 F.2d 232 (6th Cir. 1991) ........ 36

United States v. Fernandez, 388 F.3d 1199 (9th Cir. 2004) ........ 32, 36, 37

United States v. Tropiano, 418 F.2d 1069 (2d Cir. 1969) ........ 35

United States v. Turkette, 452 U.S. 576 (1981) ........ 32, 34

Walter v. Drayson, 538 F.3d 1244 (9th Cir. 2008) ........ 32

***Statutes***

18 U.S.C. § 1341 ........ 35

18 U.S.C. § 1343 ........ 35

18 U.S.C. § 1951 ........ 35

18 U.S.C. § 1961(4) ........ 32, 34

18 U.S.C. § 1962(c) ........ 10, 31, 32

18 U.S.C. § 1962(d) ........ 36, 37

18 U.S.C. § 1964(c) ........ 10, 30, 38, 45

18 U.S.C. § 2314 ........ 35

18 U.S.C. § 659 ........ 35

49 U.S.C. § 13102(23)(B) ........ 44

49 U.S.C. § 14501(c) ........ 41, 42

49 U.S.C. § 14706 ........ 44

Fla. Stat. § 501.2075 ........ 15, 27, 39

***Rules***

D. Or. LR 56-1 .......... 9, 15

D. Or. LR 7-1(a) .......... 8

D. Or. LR 7-2(b) .......... 46

Fed. R. Civ. P. 12(b)(6) .......... 11

Fed. R. Civ. P. 54(b) .......... 11

Fed. R. Civ. P. 56(a) .......... 9, 30

Fed. R. Civ. P. 56(c) .......... 15

Fed. R. Civ. P. 56(c)(2) .......... 38

Fed. R. Civ. P. 56(e) .......... 9, 11, 15

Fed. R. Civ. P. 56(g) .......... 40, 42, 44

Fed. R. Civ. P. 59(e) .......... 11

Fed. R. Evid. 803(8) .......... 38

**CERTIFICATE OF CONFERRING WITH ADVERSE COUNSEL**

Pursuant to D. Or. LR 7-1(a), the undersigned certifies that conferral with Southeast Holding LLC on this Motion is impracticable because the LLC has been without licensed counsel since the Court granted former counsel's motion to withdraw (ECF No. 49, June 13, 2023). On May 1, 2026, counsel associated with related defendant Rudolph Logan Rice confirmed in writing that he is not authorized to appear for Southeast Holding and does not anticipate authorization. Because Southeast Holding LLC cannot appear or defend without licensed counsel, it cannot at present participate in a conferral. However, the Court is aware from the motion to withdraw proceedings that Mr. Rice is an executive and owner of Southeast Holding, and if want to resume representation for his company, he may do so, through his lawyers of record.

**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56(a) and D. Or. LR 56-1, Plaintiffs Fred and Linda Marti move for summary judgment against Defendant Southeast Holding LLC on all counts of the Fourth Amended Complaint (ECF No. 100) in which Southeast Holding is named:

1. Count III Civil RICO, 18 U.S.C. §§ 1962(c) and (d), for treble damages of $68,193.00 plus attorney's fees under § 1964(c); and

2. Supplemental State Count I - Negligent hiring of D United Logistic Moving & Storage, Inc., for $22,731.00 in property damages plus $50,000.00 in emotional distress damages.

This Motion is supported by the accompanying Memorandum of Law; Plaintiffs' Statement of Undisputed Material Facts; Ex. A, the Joint Declaration of Fred and Linda Marti; the Declaration of Thad M. Guyer; the exhibits; and the records and files in this action.

Southeast Holding LLC answered this action through counsel (ECF No. 36) but has been unrepresented since June 13, 2023 (ECF No. 49). As a limited liability company, it cannot appear or defend without licensed counsel. It therefore cannot file a legally cognizable opposition to this Motion. Material facts not properly controverted should be treated as undisputed under Rule 56(e).

Plaintiffs respectfully request that the Court grant this Motion, enter judgment against Southeast Holding LLC as set forth in the Memorandum, and grant such other relief as the Court deems just.

Respectfully submitted,

*/s/ Thad M. Guyer*

Thad M. Guyer
Attorney for Plaintiffs

# MEMORANDUM OF LAW

## I. INTRODUCTION AND INCORPORATION

Southeast Holding LLC was the managing umbrella for the association-in-fact moving-broker enterprise that injured Fred and Linda Marti. Plaintiffs incorporate and apply to Southeast Holding the Rule 56, enterprise, conduct, pattern, conspiracy, and causation arguments developed in their August 13, 2025 RICO motion, together with their negligent-selection theories, the Rice-Abrams control record, Exs. 25–28, the Florida Attorney General consent judgments against enterprise entities including Southeast Holding and U.S. Pro, and the concurrently filed Statement of Undisputed Material Facts.

Southeast Holding answered (ECF No. 36), lost counsel (ECF Nos. 40, 44, 49), and remains unrepresented. Andrew R. Ingalls confirmed on May 1, 2026 that he lacked authority to appear. Ex. 24. Because an LLC cannot proceed pro se, *Rowland v. California Men's Colony*, 506 U.S. 194, 201–02 (1993), the Court considers Plaintiffs' properly supported prima facie showing without a cognizable corporate opposition.

## II. PROCEDURAL HISTORY

Plaintiffs Fred and Linda Marti filed this action on March 29, 2021. ECF No. 1. The case was assigned to the Honorable Ann L. Aiken, Medford Division.

Rudolph Logan Rice retained the Grants Pass law firm Cauble not only for himself but also for Bernard Brickel, Southeast Holding LLC, and U.S. Pro Moving and Logistics, LLC. Through that firm an answer was filed on behalf of all four defendants. ECF No. 36.

Rice later decided to abandon Southeast Holding LLC and U.S. Pro Moving and Logistics, LLC, asserting that the companies had no assets. Over Plaintiffs' objections, the Court permitted Rice to abandon the two companies he had incorporated. Shared counsel withdrew on

June 13, 2023. ECF No. 49. Southeast Holding LLC has remained without licensed counsel since that date.

Rice obtained separate counsel and moved to dismiss. On January 27, 2026, the Court issued an Opinion and Order granting Rice's motion and dismissing the claims against him. ECF No. 113. Plaintiffs moved for reconsideration under Rule 59(e). The Court denied reconsideration on April 28, 2026. ECF No. 120. The corporate defendant Southeast Holding LLC was not dismissed and remains a party.

Also pending are Plaintiffs' Rule 54(b) motion for leave to appeal the Rice dismissal, the entry of default against Abrams, and Plaintiffs' motion for default judgment against the remaining parties.

## III. EFFECT OF PRIOR RULE 12 DISMISSAL OF RICE

On January 27, 2026, the Court dismissed the claims against Rice under Rule 12(b)(6). ECF No. 113. That order tested only the legal sufficiency of the pleadings against Rice; it made no finding about his ownership, control, or direction of the enterprise. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001); *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987). Nor is the order final. It has not been certified under Rule 54(b), and Plaintiffs' motion for leave to appeal it remains pending. An uncertified interlocutory order is not "sufficiently firm" to carry preclusive weight. *Luben Industries, Inc. v. United States, 707 F.2d 1037, 1040 (9th Cir. 1983)*. ECF No. 113 therefore does not limit the Court's consideration, under Rule 56(e), of the properly supported record evidence of Rice's ownership, control, and direction now offered against Southeast Holding LLC.

## IV. INDEX OF PARTIES, WITNESSES AND ENTITIES

**A. Rudolph Logan Rice (Rice):** Managing member and Chief Executive Officer of Southeast Holding LLC (SOF ¶¶ 2, 4) with a 20 percent ownership interest (SOF ¶ 3). Officer

and managing member of U.S. Pro Moving and Logistics and related brokerages including Gold Standard (SOF ¶¶ 1, 5, 14). Directed legal and dispute functions through Bernard Brickel, authorized Anthem Claim Management, website content, D United placements, and retention of company records after closure (SOF ¶¶ 8–10, 10A–10B, 12). Received compensation and distributions from the enterprise and initially described himself as a silent investor (SOF ¶¶ 8, 11).

**B. Charles Abrams (Abrams):** Managing member of Southeast Holding LLC (SOF ¶¶ 2, 4) with a 40 percent ownership interest (SOF ¶ 3). Co-owner and operational partner with Rice and Metz (SOF ¶¶ 1, 8). Managed technology, clerical systems, and website development for the brokerages (SOF ¶¶ 2, 8, 10). Participated in formation of Southeast Holding, profit-sharing, and day-to-day sales and operations across U.S. Pro, Gold Standard, and related entities (SOF ¶¶ 1–2, 6, 8). Executed the Florida consent judgment on behalf of Southeast Holding LLC and affiliated companies (SOF ¶ 18).

**C. Daniel J. Metz (Metz):** Managing member of Southeast Holding LLC (SOF ¶¶ 2, 4) with a 40 percent ownership interest (SOF ¶ 3). Co-owner focused on sales and operational functions (SOF ¶¶ 2, 8). Participated in consolidating operations into U.S. Pro, forming Southeast Holding, and crisis discussions on the Florida Attorney General action (SOF ¶¶ 1–2, 6, 15). Shared profits and losses with Rice and Abrams as an equal partner (SOF ¶ 8).

**D. Southeast Holding LLC:** Florida limited liability company and managing umbrella for the association-in-fact moving-broker enterprise (SOF ¶¶ 2, 6). Received the profits of U.S. Pro and the related brokerages (SOF ¶¶ 2, 6). Named defendant; answered through shared counsel and has remained unrepresented since counsel's withdrawal in June 2023 (SOF ¶ 28).

Included in the Florida Attorney General consent judgments permanently enjoining the enterprise (SOF ¶ 18).

**E. U.S. Pro Moving and Logistics, LLC:** Household-goods broker that contracted with Plaintiffs Fred and Linda Marti in October 2020 (SOF ¶ 19). Operated as part of the enterprise controlled through Southeast Holding (SOF ¶¶ 1–2, 6, 14). Used the same personnel, claims process, and carrier-selection practices as the related brokerages (SOF ¶¶ 1, 7, 9). Answered and later became unrepresented after shared counsel withdrew.

**F. Jaime Fries (Fries):** Director of operations who ran day-to-day business, including payroll, training, banking, complaint response, and forwarding of claims to Anthem (SOF ¶¶ 8–9). Worked across multiple entities owned by Rice, Abrams, and Metz (SOF ¶ 1). Retained the office desktop computer containing company records, including Marti documents, at her home after closure (SOF ¶¶ 8, 12). Used the alias "Jaime Taylor" when dealing with certain customers (See FN 8). Later joined Rice's Millennium (See FN 5, 13).

**G. Bernard Brickel (Brickel):** Florida-registered paralegal, formerly admitted to the New York bar (SOF ¶ 10). Handled dispute resolution, post-loading payment demands, and legal correspondence for U.S. Pro under Rice's sole direction (SOF ¶¶ 8–10, 10A). Had no working relationship with Abrams or Metz (SOF ¶ 10). Understood Rice to be the owner of U.S. Pro (SOF ¶¶ 10, 10A). Received occasional informal payments from Rice rather than a set salary (SOF ¶ 10).

**H. Richard King (King):** Former enterprise employee who performed quality-assurance work and later operations functions (See FN 6). Worked for multiple brokerages within the enterprise (See FN 6). After the office closed, retained physical and digital company records,

including DOT complaint responses and banking documents, in personal storage (See FN 11, 12) with Rice's express approval (SOF ¶ 12). Later worked with Fries at Millennium (See FN 5).

**I. D United Logistic Moving & Storage, Inc.:** Motor carrier selected by the enterprise and assigned to transport Plaintiffs' household goods (SOF ¶¶ 9, 19). Arrived late, required blank federal forms, imposed charges exceeding the binding estimate, stored goods, and allegedly lost or damaged property including a family heirloom gold watch valued at $15,000 (SOF ¶¶ 19, 21–22, 24). Fries estimated she had placed more than ten customers with D United and did not know whether the number exceeded fifty (SOF ¶ 9).

**J. Anthem Claim Management:** Third-party claims administrator used by U.S. Pro and related brokerages for loss-and-damage claims (SOF ¶ 9). Fries forwarded documents; Abrams confirmed brokers were required to use claims companies such as Anthem (SOF ¶ 9). Plaintiffs' claims were directed to Anthem after U.S. Pro declined to handle them directly (SOF ¶¶ 9, 20–21).

**K. Florida Attorney General:** Conducted a multi-year investigation into the enterprise (SOF ¶¶ 13–16). A formal complaint was filed in the Circuit Court for Broward County, Case No. CACE-22-017919 (SOF ¶¶ 13, 17–18). Plaintiffs provided information to that office before this action. Consent final judgments were entered against Rice, Abrams, Metz, Southeast Holding LLC, U.S. Pro, and related entities (SOF ¶¶ 17–18). The judgments imposed $400,000 in consumer relief and $1,500,000 in civil penalties under Fla. Stat. § 501.2075 against the Abrams Defendants jointly and severally, totaling more than $3 million, and permanently banned the defendants from owning, operating, or managing moving-brokerage activities (SOF ¶¶ 17–18).

**L. Broward County Circuit Court:** Entered the Consent Final Judgments and Permanent Injunctions in Case No. CACE-22-017919 (SOF ¶¶ 17–18). The judgments bar Rice, Abrams, Metz, and the corporate defendants, including Southeast Holding LLC, from owning, operating, or managing moving-brokerage activities (SOF ¶¶ 17–18).

**M. Millennium:** Insurance company formed by Rice after the Florida Attorney General action shut down the moving-broker enterprise. Staffed in part by former enterprise personnel, including Jaime Fries and Richard King (See FN 5). Fries continued her record-keeping role there (See FN 5, 13).

## V. PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Fed. R. Civ. P. 56(c) and D. Or. LR 56-1, Plaintiffs submit these undisputed facts and incorporate the August 2025 RICO fact development, supporting statements and deposition exhibits, the ECF No. 113 evidentiary package, Exs. 25–28, the Florida Attorney General consent judgments, and the Marti damages evidence (4AC Appendix A; Ex. A, Joint Declaration). Exhibit numbers refer to the marked exhibits accompanying this filing.

### A. <u>Enterprise Origins and Early Consolidation</u>

1. Rice and Abrams first met while working in sales at RightWay Funding, a business dealing in annuities and structured settlements (Ex. 2, Abrams I Depo., 41–42:23–24; 42:1–24) (See Index of Parties, A and B). When Razor Van Lines' bank account was frozen, Abrams and Metz turned to Rice, who already owned U.S. Pro Moving and Logistics with a functioning bank account and Department of Transportation credentials (See Index of Parties, C and E). Their operations were merged into U.S. Pro to continue business without interruption (Ex. 2 at 30:2–7; 38:2–5, 19–22).[1] Fries met Rice through Metz and Abrams and worked across multiple

[1] Rice was engaged in an insurance business with Abrams and Metz. He admitted no knowledge of the moving industry. Abrams negotiated his role as a minority owner and silent

brokerages - United American Moving, Spartan Van Lines, U.S. Pro Moving, United Pro Van Lines, Razor Van Lines, and Gold Standard Moving - most owned by Abrams, Metz, and Rice (Ex. 6, Fries Depo., 14:20–23; 19:5–10; 9:8–15, 20–24). Abrams confirmed he, Rice, and Metz were partners in these companies, which operated under different names but as one enterprise (Ex. 2 at 14:4–9; Ex. 3, Abrams II Depo., 9:9–16). U.S. Pro was the final iteration. (Ex. 3 at 9:22–23).

### B. Formation of Southeast Holdings and Enterprise Structure

2. Fries denied knowledge of the enterprise's incorporation or profit-sharing, testifying that Rice rarely came to the office and that she did not know his role in incorporating Southeast Holding or U.S. Pro (Ex. 6 at 57:5–8, 13–25) (See Index of Parties, F and D).[2] Rice admitted he assisted in launching Southeast Holdings, saying he "helped set that up online" because he was "probably more organized of the three" (Ex. 1, Rice Depo., 28:13–17).[3] The three formed Southeast Holdings, LLC, as the umbrella company, with Rice's 20 percent equity exchanged for use of his company name and DOT number (Ex. 2 at 115:10–18; 116:13–20). Rice was designated CEO, Abrams chief technology officer, and Metz chief operating officer. Corporate filings listed all three as officers and managing members with their backgrounds (Ex. 2 at

---

investor (Ex. 1 at 12:4–10). Metz confirmed his first collaboration with Rice occurred in 2019–2020, when they operated U.S. Pro Moving and Logistics with Charles and Michael Abrams (Ex. 5 at 10:3–10, 20–23).

[2] Executive Van Lines was a last attempt after Gold Standard collapsed amid Department of Transportation investigation (Ex. 2 at 65:13–22).

[3] Ownership was divided 40 percent to Metz, 40 percent to Abrams, and 20 percent to Rice (Ex. 1 at 28:18–21). Rice confirmed that his 20 percent share extended to other brokerages (Ex. 1 at 40:16–22). Rice joined U.S. Pro around 2020 and it operated six months to a year (Ex. 2 at 44:18–25). Their bank account was closed and Rice offered his incorporated company (Ex. 3 at 10:5–11). U.S. Pro existed only on paper, with no employees but some customers (Ex. 3 at 10:18–25; 11:5–11). They adopted a new operating agreement superseding Rice's original incorporation listing him as sole owner (Ex. 3 at 12:2–6).

118:11–16; 140:18–23).[4] All profits from brokerages flowed into Southeast Holdings, which functioned as the umbrella structure for the partnership (Ex. 2 at 13:11–18; 13–14:25–2; 45:9–15).

### C. Operations, Workforce, and Continuity into Millennium

3. Rice owned 20%, Abrams 40%, and Metz 40% of Southeast Holding LLC. Ex. 1 at 28:18–21; Ex. 2 at 116:1–2, 14–20, 118:11–13.

#### *1. Division of Roles and Management Structure*

4. Rice was listed as Chief Executive Officer and a managing member of Southeast Holding, and Abrams as a managing member/officer, on corporate officer listings discussed in Ex. 2 (managing members identified as Rudolph Rice, Charles Abrams, and Daniel Metz; Rice as CEO, Abrams as chief technology officer, and Metz as chief operating officer, at 118:11–16).

#### *2. Carrier Relationships, Complaints, and Claims Handling*

5. Rice was listed as an Officer/Managing Member on Gold Standard Moving and Storage's officer listing, with U.S. Pro Moving and Logistics shown as his moving-industry experience; Abrams and Metz were listed on the same page with United American Moving, Razor Van Lines, and Gold Standard Moving and Storage. Ex. 9 (DefProd000237).

#### *3. Rice's Control of Legal Functions Through Brickel*

6. Abrams: SE Holding was a holding company for any of the moving brokerages; profits flowed into SE Holding. Ex. 2 at 13:10–18, 45:9–15.

---

[4] RAM Funding, LLC, named for Rice, Abrams, and Metz, was created though never significant (Ex. 2 at 148:11–18).

#### *4. Rice's Non-Transparent Financial Benefiting from the Enterprise*

7. U.S. Pro employees also worked for other enterprise brokerages and were classified as 1099 contractors, not W-2 employees (Ex. 6 at 32:8–13). About 22 workstations were available, and compensation was commission-based (Ex. 6 at 33:5–6; 34:4–5). Abrams confirmed that Fries carried over from the earlier companies and was authorized to handle customer issues for the partners. (Ex. 2 at 94:2–9; Ex. 3 at 15:13–15; 36:11–14).[5]

#### *5. Rice's Control of Enterprise Records*

8. The enterprise operated without formal hierarchy. Abrams, Rice, and Metz were equals, each receiving weekly salaries and sharing profits or losses (Ex. 3 at 22:2–7; 13–14:25–2; 14–15:22–1). Abrams described Rice as steady, delegating and responsible for addressing issues with employees and carriers, Metz focused on sales, and Abrams himself managed clerical and technical tasks (Ex. 3 at 22–23:25–20; 23:6–13, 21–23). Rice was regularly present, less often than Abrams and about as often as Metz, and all three shared office space (Ex. 3 at 13:17–23; 37:19–23). Day-to-day management was carried out by Jaime Fries, described by Abrams as running "pretty much…the entire business" (Ex. 3 at 35–36:25–5). King confirmed she was director of operations with responsibility for payroll, records, training, financial management, and banking (Ex. 7, King Depo., 29:2–9). Fries admitted she kept company desktops with records, including Marti documents, at her home after closure (Ex. 6 at 35:19–25; 36:15–17). Legal correspondence sometimes went through her, and they consulted Bernard Brickel (Ex. 6 at 10:2–10; Ex. 7, pp. 16–17).[6]

---

[5] Rice's later insurance company, Millennium, was staffed with former colleagues. King identified Kayla Ramirez and Scotty Lest as Millennium employees, though Scotty had not worked at U.S. Pro (Ex. 7 at 15:14–23; 16:6–12). After deciding not to continue Kinetic Moving, he and Fries contacted Millennium and were hired within days (Ex. 7 at 17:3–7).

### D. The Marti Contract and Experience

9. Carrier relationships were maintained through dispatchers who contacted movers with load board postings (Ex. 3 at 16–17:23–4; 17:6–9; 17–18:21–2). Fries explained carriers had to sign "409" broker/carrier agreements (Ex. 6 at 47:2–8). She had familiarity with D United Logistics and Moving, estimating she had placed more than ten clients with them and stating she did not know whether the number exceeded fifty (Ex. 6 at 21:9–24) (See Index of Parties ¶ I). Abrams conceded there was no real system of vetting movers beyond DOT registration and reviews, admitting he simply relied on the dispatch manager's experience (Ex. 3 at 18:10–20; 19:11–23).[7] Complaints were routed internally: Vanessa Pritchet handled Department of Transportation and Better Business Bureau complaints, Fries court correspondence, and Brickel legal disputes (Ex. 6 at 10:2–10; 50:17–25; Ex. 7 at 35:17–21; 36:2–10). Fries identified Anthem Claim Management as the third-party claims handler, with her own role limited to forwarding documents (Ex. 6 at 22:9–13, 24–25) (See Index of Parties ¶ J). Abrams confirmed that a broker is "required to have some business like that" to handle claims, although he did not recognize Anthem Claim Management by name (Ex. 3 at 20–21:25–15).[8]

[6] King first worked in quality assurance, later shifting to operations (Ex. 7 at 27–28:20–2; 27:16–18). He noted Fries' role in training, oversight, and finances (Ex. 7 at 29:2–9). Rice was "never there," but conceded he lacked knowledge if Rice worked "behind the scenes" (Ex. 7 at 20:21–25; 21:1–6). King's salary came from United American, U.S. Pro, Gold Standard, and possibly Executive - but he was uncertain of the timeline (Ex. 7 at 19:12–20). King testified that Abrams came into the office but was much more on the sales floor than in the quality-assurance office (Ex. 7 at 36:21–25).

[7] Consumer deposits were retained by the enterprise itself, covering leads, salespeople, and carrier assignments (Ex. 2 at 31:12–15; 33:17–23).

[8] Abrams confirmed Fries often used the alias "Jaime Taylor" to avoid retaliation from angry customers (Ex. 2 at 125–126:24–8; 126:10–12).

### E. Website Deception and Complaints to U.S. Pro

10. Brickel's background was in consumer fraud, including false advertising and bait-and-switch practices, though he was disbarred in New York after involvement in a business transaction (Ex. 10, Brickel Depo., 6:1–14; 9:5–9; 10:13–20; 11:1–7) (See Index of Parties ¶ G). He later taught at the University of Connecticut and registered in Florida as a paralegal (Ex. 10 at 11:12–14, 19–20; 16:9–14). His work for the moving enterprise was directed solely by Rice, whom he understood to be associated with U.S. Pro and whom he believed owned it (Ex. 10 at 20:5–25; 21:1–8). Brickel confirmed that at U.S. Pro he interacted only with Rice, and that U.S. Pro was the only moving company for which he provided services, which he did at Rice's request (Ex. 10 at 21:5–8; 23:15–20).

10A. As to payment, he explained that he had no set compensation but Rice would occasionally give him money for his services (Ex. 10 at 23–24:25–4). At U.S. Pro Brickel had little interactions with anyone other than Rice. (Ex. 10 at 21:5–8). When Abrams and Metz joined Rice at U.S. Pro Moving and Logistics, Rice's company was already a going concern (Ex. 2 at 30:5–7; 38:19–22). Abrams explained that while he had created the first website for United American Moving, the website for U.S. Pro had been set up under Rice's direction. Asked specifically how the U.S. Pro website was created, Abrams stated, "That one? You'd have to ask Rudy. I'm not sure" (Ex. 2 at 75:19–21). In a later deposition, Abrams confirmed that he believed the website was "already in existence" and "was Rudy's in that situation" (Ex. 3 at 20:8–10).

10B. Abrams admitted that the U.S. Pro website likely assured consumers that the company worked only with "very professional movers." Although he could not recall the exact phrasing, he could "assume it was on the website" because "that was absolutely our target goal" (Ex. 3 at 19–20:25–5). U.S. Pro's customer emails also projected expertise far beyond what the

enterprise possessed. Despite Rice's lack of prior experience in the moving industry, a U.S. Pro customer email described the company as a "nationally recognized expert in the moving and relocation industry," promising that the move would be "problem free" and completed "without hassle" (Ex. 2 at 131:17–25). Abrams conceded that these claims were not factual but only opinion, acknowledging that while "to the average person" everyone in the office might appear to be a nationally recognized expert, the claim was "a matter of opinion, it's not fact" (Ex. 2 at 132:5–7).

10C. At the same time, Abrams confirmed that there were certain statements the enterprise was legally required to display on its websites. The site had to include the Department of Transportation number and MC number and also had to disclose that the company was a broker rather than a carrier (Ex. 2 at 80:7–12). He acknowledged that he knew "a couple of things that needed to be on there" for regulatory compliance (Ex. 2 at 80:6–7). While he may have created the first website for United American Moving, the companies eventually began paying others to build their websites (Ex. 2 at 72:19–22).

10D. The U.S. Pro's website combined required DOT/MC disclosures with sweeping, fabricated claims of industry expertise. Consumers saw a site that appeared to comply with federal regulations while simultaneously promising professional, nationally recognized moving services - assurances that Abrams admitted were false and that Rice had no actual ability to deliver. Accordingly, when Abrams and Metz merged their operations into Rice's existing enterprise, they joined a company already engaged in website deception, one that mixed mandatory legal disclaimers with fraudulent advertising to create a veneer of legitimacy.

**F. <u>Coordinated Fraudulent Enterprise</u>**

11. Compensation within the moving enterprise was shared among the three principals. Abrams confirmed that he, Rice, and Metz all received weekly salaries, in addition to sharing

profits or losses depending on the company's financial performance (Ex. 3 at 14–15:22–1).[9] Rice himself admitted that his entry into the moving business was motivated by investment opportunities rather than operational expertise. He "had no idea what [he] was doing" and initially saw himself as a minority owner and silent investor in Abrams and Metz's enterprise (Ex. 1 at 12:4–10).[10] Despite this ownership stake and his admissions of financial benefit, the manner in which Rice received payments was opaque. Fries, who handled payroll and other financial functions, confirmed that she regularly prepared checks for Abrams and Metz but was unsure of the exact amounts (Ex. 6 at 49:5–12). When asked specifically about Rice, Fries initially stated that she also cut checks to him, but upon clarification, she reversed herself. She testified unequivocally: "Rice did not get any pay. I did not pay Rudolph Rice" (Ex. 6 at 49–50:21–3). Fries explained that any money Rice received from the enterprise must have flowed through other channels outside her knowledge or control.

### G. Monetary and Emotional Damages

12. Richard King retained possession of company records from the moving enterprise after the office move-out, including business records he stored at his expense (Ex. 7 at 8:19–22; 10:5–8; 21:20–25) (See Index of Parties ¶ H).[11] Upon vacating the office, King preserved company files, citing record-keeping requirements, and confirmed that he informed Rice at the

---

[9] The three partners considered themselves equals without a chain of command (Ex. 3 at 13–14:25–2). He received salaries "on and off" depending on the company's condition and occasional profit-sharing payments (Ex. 5 at 13:20–21).

[10] His ownership interest in Southeast Holdings, LLC was 20 percent, with Metz and Abrams each holding 40 percent (Ex. 1 at 28:18–21). His 20 percent interest extended to other moving brokerages jointly owned with Abrams and Metz (Ex. 1 at 40:15–22), and he received a salary from the companies (Ex. 1 at 12:13–18).

[11] DOT complaint-response and Anthem blank-form characterizations should be read with the marked King excerpt and full transcript pins. He obtained the DOT complaint from a file cabinet in his personal storage unit (Ex. 7 at 8:19–20).

time. Rice expressly approved this arrangement, responding simply "okay" when told the documents would be taken into King's possession (Ex. 7 at 10:10–22). King maintained both physical and digital business records, including bills of lading, general forms, signed employee documents, and files stored in a cloud account (Ex. 7 at 21:21–25).[12] Jamie Fries likewise retained control of company records with Rice's knowledge, even after the Florida Attorney General shut down the moving enterprise. She had possession of the original desktop computer from her office, which contained records of the moving companies, including documents produced in the Martis litigation (Ex. 6 at 35:19–25). She confirmed that she kept this desktop at her home (Ex. 6 at 36:15–17).[13]

### H. Florida Attorney General Complaint AND CONSENT JUDGMENT

13. Florida Consumer Protection Division and DOT OIG Findings On December 8, 2022, the Florida Attorney General issued AG Moody Acts to Stop Massive Moving Scam (Dec. 8, 2022), announcing action against three individuals, two holding companies, and multiple moving brokerages including Gold Standard, Executive Van Lines, Imperial, National American, Razor, Simple Path, Spartan, United American, and U.S. Pro (See Index of Parties ¶ K). More than 400 Floridians were deceived by false mover claims, subcontracting to unvetted carriers, inflated prices, refusal of refunds, and serial name changes (Fla. Att'y Gen., AG Moody Acts to

---

[12] Metz knew of this, King never told Abrams, and he did not know whether Rice had done so (Ex. 7 at 23:8–18). He also retained banking records from the moving companies, identifying Horizon, Chase, and First Farmers and Lafayette (Ex. 7 at 29:14–19).

[13] Fries transitioned to Rice's insurance venture, Millennium, bringing her record-keeping role. He claimed that any substantive documents were with Charles Abrams and that he had only used inexpensive desktop computers for routine tasks. Rice stated: "if you would like documents that are related to moving, I would implore you to go after Charles Abrams" (Ex. 1 at 35:19–23).

Stop Massive Moving Scam (Dec. 8, 2022)).[14] The Attorney General identified U.S. Pro Moving and Logistics among the brokerages operating under the enterprise's serially changed names (Fla. Att'y Gen., AG Moody Acts to Stop Massive Moving Scam (Dec. 8, 2022)). The Department of Transportation Office of Inspector General described the same enterprise, operated by Charles Abrams through Gold Standard Moving and Storage LLC, as misrepresenting its carrier operations and concealing its practices behind a single call center that posed as numerous companies (U.S. Dep't of Transp. Office of Inspector Gen., Civil Complaints Filed Against Multiple Moving Companies for Deceptive Practices (Dec. 8, 2022)).

14. From December 2019 to April 2020, U.S. Pro Moving and Logistics and Rudolph Rice operated as a broker subject to FMCSA rules but violated those regulations and FDUTPA (Ex. 20, FL AG Compl. ¶ 259). U.S. Pro was part of the Gold Standard Enterprise by April 2020 (Ex. 20 ¶ 153). The Individual Defendants, including Rice, controlled the enterprise, participated in deceptive practices, and had knowledge of its acts (Ex. 20 ¶¶ 122, 172). Rice was officer/director/manager of U.S. Pro, Executive, Imperial, and Gold Standard, and manager of Southeast Holding (Ex. 20 ¶ 87). He signed bank accounts, registered companies with FMCSA, had consumer contact, and knew of complaints (Ex. 20 ¶¶ 88–90). Funds and payroll were intermingled, and names/phone numbers used interchangeably, evidencing a unified scheme (Ex. 20 ¶¶ 123–124).

[14] About $27 million in fines and restitution was secured against 19 firms, including a $21 million judgment (Fla. Att'y Gen., AG Moody Acts to Stop Massive Moving Scam (Dec. 8, 2022)). The U.S. Department of Transportation Office of Inspector General's Civil Complaints Filed Against Multiple Moving Companies for Deceptive Practices confirmed coordinated enforcement against lowball estimates, bait-and-switch pricing, and false carrier claims (U.S. Dep't of Transp. Office of Inspector Gen., Civil Complaints Filed Against Multiple Moving Companies for Deceptive Practices (Dec. 8, 2022)).

15. The Attorney General determined enforcement served the public interest (Ex. 20 ¶ 10). Abrams and Metz were interviewed by FMCSA agents (Ex. 20 ¶¶ 79, 85). Defendants misled consumers into believing they were contracting with carriers providing high-quality service and violated FDUTPA through deceptive advertising and sales (Ex. 20 ¶¶ 169, 170, 245). From April 2020 forward, defendants failed to disclose broker status and issued estimates not based on carrier tariffs, violating FMCSA and the I.T.C., in a pattern they knew or should have known was deceptive (Ex. 20 ¶¶ 185, 188, 260). Rice specifically controlled U.S. Pro and participated in its deceptive practices (Ex. 20 ¶ 247). When the principals first learned of the Attorney General action, Metz spoke with Abrams and Rice about it; asked who took part, Metz identified "me, Charlie and Rudy." Ex. 5, Metz Dep., 21:11–15.

16. The Attorney General documented more than 660 consumer complaints across the enterprise (Ex. 20 ¶¶ 132, 140, 148) and concluded the practices would likely continue to injure the consuming public (Ex. 20 ¶ 187).[15] Consumers consistently reported being misled into believing they contracted with a carrier; after deposits, responsiveness ceased, a different company arrived demanding more money, and delivery was delayed (Ex. 20 ¶¶ 133–135, 149–151).[16]

17. On November 5, 2024, the Circuit Court for Broward County entered a Consent Final Judgment and Permanent Injunction against Rice in Case No. CACE-22-017919, resolving his individual liability (Ex. 25, Consent Final Judgment ("CJ") at 5) (See Index of Parties ¶ L). Rice accepted jurisdiction without admitting the allegations (CJ § 3.1). He is permanently barred,

---

[15] Totals included United American (210) (Ex. 20 ¶ 132), Razor (55) (Ex. 20 ¶ 140), and U.S. Pro (400) (Ex. 20 ¶ 148).

[16] Most transactions occurred 2019–2021 (Ex. 20 ¶¶ 137, 152).

directly or indirectly, from owning, managing, or participating in moving brokerages or providing moving-related services in Florida or to Florida consumers (CJ § 4.1(a)–(b)), pay $89,915.40 in consumer relief (CJ § 5.1), and waive claims to funds held by processors or banks in his or the corporate defendants' names (CJ § 5.3).[17]

18. Florida AG Consent Judgments (Broward CACE-22-017919): On November 5, 2024, the court entered Consent Final Judgment and Stipulated Permanent Injunction against Rudolph Logan Rice, permanently enjoining him from owning, operating, controlling, or managing moving-broker activities. The judgment's enterprise definition includes Gold Standard, US Pro, Spartan, Southeast Holding LLC, and Southeast Holdings LLC. (Ex. 25). On November 5, 2024, the court entered parallel Consent Final Judgment against Daniel J. Metz. (Ex. 27). On February 27, 2025, the AG and the Abrams Defendants - including Abrams, Gold Standard, United American, Razor, US Pro, Executive, Spartan, Southeast Holdings LLC, and Southeast Holding LLC - jointly moved for Consent Final Judgment. (Ex. 26B).

On March 6, 2025, Judge Bidwill granted that joint motion and entered Consent Final Judgment against the Abrams Defendants. (Ex. 26). The Abrams consent judgment imposes on the public docket: $400,000 consumer relief; $1,500,000 civil penalties under Fla. Stat. § 501.2075 jointly and severally; related judgment components of $1,519,000 and Corporate Judgment Amount of $3,019,000.[18] The Abrams consent judgment permanently enjoins Consent Defendants (including Abrams, Gold Standard, SE Holding LLC, and SE Holdings LLC) from owning, operating, controlling, or managing prohibited moving-brokerage activities. Abrams

---

[17] He must testify, if called, about dealings with codefendants (CJ at 19).

[18] These are non-confidential, on-the-record consent penalty and relief payments.

executed with authority to bind Gold Standard, US Pro, Southeast Holding LLC, and Southeast Holdings LLC.[19] (Ex. 26B).

## I. <u>Damages to the Plaintiffs Fred and Linda Marti:</u>

19. Contract Formation with U.S. Pro and Breach On October 19, 2020, the Martis entered a written "Binding Moving Estimate" with U.S. Pro Moving and Logistics after being contacted by phone through an internet referral. The contract was executed electronically and confirmed by email. Payment of a $778 deposit was extracted that same day when U.S. Pro created a check from their account without signed authorization (Ex. A, Joint Decl. ¶¶ 9–10). Two further estimates followed in November, each demanding additional sums. After freezing the first account, the Martis were compelled to wire $500 from another (Ex. A, Joint Decl. ¶ 13). Carrier identity was withheld until November 23, only two days before their move deadline, when the Martis were given only a phone number and themselves discovered that D United was the carrier (Ex. A, Joint Decl. ¶¶ 14–15). On November 18 they attempted to cancel within the contractual five-day window, but U.S. Pro coerced them to proceed by demanding another $500. They withdrew the cancellation and paid (Ex. A, Joint Decl. ¶ 13). D United breached the agreements by arriving late, forcing the Martis to sign blank federally required forms, and later imposing cash demands far exceeding the binding estimate (Ex. A, Joint Decl. ¶¶ 16–19).

20. The Martis reviewed the U.S. Pro website before contracting. It described U.S. Pro as a "nationally recognized" moving company with "years of experience," assuring professional staff and smooth, hassle-free moves (Ex. A, Joint Decl. ¶¶ 7–8). These assurances were material

[19] Ex. 28, the Florida AG's March 21, 2025 press release, announces lifetime industry bans and final judgments totaling more than $4 million against the enterprise operated by Abrams, Rice, and Metz, listing Gold Standard, US Pro, and related brokerages. Cited as public-record evidence of control, not as issue-preclusive RICO findings.

to their decision. In reality, U.S. Pro outsourced to D United, disclaimed responsibility when problems arose, and failed to deliver on its advertised expertise (Ex. A, Joint Decl. ¶¶ 7–8, 14–15). After problems emerged, the Martis complained directly to U.S. Pro and repeatedly to Jaime Fries, its customer service manager (Ex. A, Joint Decl. ¶¶ 12–15). Their complaints about D United were dismissed, and no responsibility was taken (Ex. A, Joint Decl. ¶¶ 13–15).[20] Rather than addressing their complaints, U.S. Pro and Fries directed them to Anthem Claim Management. The Martis were told U.S. Pro would not process claims itself, and Anthem provided only limited, inadequate responses (Ex. A, Joint Decl. ¶¶ 17–18).[21]

21. The Martis experienced the entire sequence as a coordinated scheme. U.S. Pro obtained their business through false claims of professionalism (Ex. A, Joint Decl. ¶¶ 7–9). Payment was extracted through unauthorized account withdrawals and coerced sums after attempted cancellation (Ex. A, Joint Decl. ¶¶ 10, 13). Carrier identity was concealed until days before the move, preventing evaluation. D United then imposed unlawful practices: late arrival, blank forms, and inflated charges (Ex. A, Joint Decl. ¶¶ 14–19). Complaints were dismissed or diverted to Anthem (Ex. A, Joint Decl. ¶¶ 17–18).[22]

22. The Martis suffered extensive losses. D United placed their goods into storage without consent, conditioned release on unlawful ransom payments, and still delivered missing or damaged items (Ex. A, Joint Decl. ¶¶ 8–9, 12–22). Among the most serious was the theft of a

---

[20] They learned that U.S. Pro and Fries had been the subject of numerous negative consumer reviews: misrepresentation, price increases, and failure to honor contracts (Ex. A, Joint Decl. ¶ 16).

[21] This deflection deprived them of meaningful redress.

[22] Misleading advertising, contractual breaches, and denial of accountability appeared coordinated between U.S. Pro, its representatives, and its chosen carrier from website promises through to final refusal of responsibility (Ex. A, Joint Decl. ¶¶ 6, 7–19, 31).

family heirloom gold watch valued at $15,000, stolen from a pried-open safe while in D United's custody. The watch never reached them and was converted to defendants' use. This loss was separately pleaded in the Fourth Amended Complaint as conversion damages (Ex. A, Joint Decl. ¶¶ 13, 19; 4AC ¶¶ 243–245). Additional losses included inflated moving charges, ransom payments, and costs to recover property wrongfully withheld or damaged (Ex. A, Joint Decl. ¶¶ 8–11, 12–23). The ordeal caused severe emotional distress. Weeks of uncertainty over their possessions, escalating ransom demands, and refusals of responsibility left them anxious and sleepless (Ex. A, Joint Decl. ¶¶ 26, 29).[23]

**J. <u>Listing of Damages Appendix:</u>**

23. Net moving charges paid: $5,178.00 ($978 U.S. Pro net + $4,200 D United), as set forth in Ex. A, Joint Decl. ¶ 11 and 4AC Appendix A.

24. Property never delivered: $16,185.00 including $15,000 heirloom gold watch. Ex. A, Joint Decl. ¶¶ 13–18; Exs. 16–17.

25. Property delivered damaged: $1,368.00. Ex. A, Joint Decl. ¶¶ 19–22. Total property losses: $17,553.00. 4AC Appendix A.

26. RICO actual damages claimed: $22,731.00 (property-related totals as itemized above and in Ex. A, Joint Decl. ¶ 24); treble under 18 U.S.C. § 1964(c): $68,193.00 (3 × $22,731). 4AC Appendix A.

27. Emotional distress (State Count I): $50,000.00. Ex. A, Joint Decl. ¶¶ 25–30.

28. SE Holding answered ECF No. 36; unrepresented since ECF No. 49; Ex. 24, Ingalls May 1, 2026 email, confirms no authorization to appear for SE Holding.

---

[23] The theft of the gold watch had sentimental value (Ex. A, Joint Decl. ¶¶ 13, 28). U.S. Pro's refusal to take responsibility intensified their sense of helplessness and betrayal (Ex. A, Joint Decl. ¶¶ 6, 25, 29).

## SECTION A. FEDERAL CLAIMS

The MPSJ arguments concerning Rice apply to Southeast Holding because the same undisputed ownership, management, website, carrier selection, retention practices, and profit flows establish the company as the RICO "person" and managing umbrella conducting the enterprise through Rice, Abrams, and Metz. *Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163 (2001)*; Reves v. Ernst & Young, 507 U.S. 170, 179, 185 (1993).

## VI. LEGAL STANDARD UNDER RULE 56

Rule 56(a) requires judgment when no genuine dispute of material fact exists and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986), requires the movant to identify record evidence establishing its claim or the opponent's evidentiary failure; the opponent must then produce specific admissible facts, not metaphysical doubt or conclusory speculation. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Soremekun v. Thrifty Payless*, Inc., 509 F.3d 978, 984 (9th Cir. 2007).

Plaintiffs meet that burden through testimony from Rice, Abrams, Metz, Fries, King, and Brickel. Their admissions establish the enterprise, Rice's, Abrams's, and Southeast Holding's operation and management, related predicates, and direct injury. SOF ¶¶ 1–2, 6–10, 12, 19–22. Summary judgment is proper when uncontroverted evidence establishes the enterprise, participation, pattern, and injury.

## VII. UNDISPUTED FACTS SUPPORT SUMMARY JUDGMENT UNDER RICO

### A. Civil RICO Liability Under 18 U.S.C. § 1962(c)

Section 1962(c) requires conduct of an interstate enterprise through a pattern of racketeering that injures business or property. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). *Reves, 507 U.S. at 179*, is satisfied by Rice's and Abrams's management authority, Rice's selection of Brickel, authorization of Anthem, and control of complaint records, all

exercised through Southeast Holding. SOF ¶¶ 2, 4, 8–10, 12. The common ownership, personnel, management, and uniform marketing, pricing, claims, and complaint practices establish an enterprise under 18 U.S.C. § 1961(4), *United States v. Turkette*, 452 U.S. 576, 583 (1981), and *Boyle v. United States*, 556 U.S. 938, 946 (2009). The shared participants, victims, purposes, and methods persisted for years, satisfying *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239–42 (1989). Deceptive communications support mail and wire fraud, threatened nondelivery supports extortion, and the missing shipment supports theft predicates. SOF ¶¶ 10, 19–22.

**B. <u>Rice's Conduct and Participation</u>**

Section 1962(c) reaches a person who directly or indirectly conducts an enterprise's affairs through racketeering. Reves, 507 U.S. at 179, requires some part in operation or management, including lower-level direction integral to the enterprise. *United States v. Fernandez,* 388 F.3d 1199, 1228-30 (9th Cir. 2004)*, cert. denied,* 544 U.S. 1043 (2005), *amended on other grounds,* 425 F.3d 1248 (9th Cir. 2005). Rice and Abrams were managing members of U.S. Pro and Southeast Holding with authority over policies, resources, and strategy. SOF ¶¶ 2, 4, 10, 14. His ownership and decision-making role, corroborated by his control of personnel, claims, records, and carrier practices, and Abrams's control of marketing, satisfy Reves even if he was not the ultimate decision-maker.

Rice engaged Brickel to manage disputes after customers' goods were loaded and charges increased. SOF ¶¶ 9, 10, 19, 21–22. Brickel acted under Rice's direction when release was conditioned on additional payment, conduct supporting Hobbs Act extortion. Ex. 10, pp. 20–23. Selecting and supervising the person enforcing the enterprise's payment leverage was core operational direction under Reves, not administration. The Ninth Circuit distinguishes ordinary professional services from directing the enterprise's affairs. *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008). Brickel's post-loading enforcement under Rice's direction crossed that

line. *Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997); *Napoli v. United States,* 32 F.3d 31, 36 (2d Cir. 1994)*, adhered to on reh'g,* 45 F.3d 680 (2d Cir. 1995).

### C. Authorization of Fraudulent Claims Processing

Rice and Abrams authorized Anthem Claim Management to handle loss-and-damage claims. SOF ¶¶ 9, 20. Fries testified that he directed the arrangement, which minimized payouts and discouraged recovery. Choosing a claims system that obstructed legitimate claims and preserved enterprise proceeds was a strategic policy decision supporting operation, management, fraud predicates, and scienter under Reves.

### D. Control over Record Retention and Concealment

King testified that Rice approved retention of DOT complaint responses and operational records. SOF ¶ 12. Control of sensitive records affected regulatory and civil access to evidence and protected continued operations. Such authority over information that could expose the scheme is managerial participation, not neutral recordkeeping.

### E. Evidence of Direction Across the Enterprise

Rice's and Abrams's authority extended across U.S. Pro, Gold Standard, Executive, Imperial, and Southeast Holding. Employees moved among commonly owned entities under centralized oversight, while dispute, claims, and complaint protocols remained uniform. SOF ¶¶ 1, 7–10, 14.

## VIII. SOUTHEAST HOLDING'S DIRECT CONNECTION TO PREDICATE ACTS

Rice's appointments and policies facilitated the predicates: Brickel enforced post-loading charges under threatened nondelivery; Anthem transmitted and implemented claim denials; and controlled records helped the enterprise withstand complaints and continue. SOF ¶¶ 9, 10, 12, 19–22.

**A. Existence of an Enterprise**

An association-in-fact enterprise requires a common purpose, relationships, and longevity, but no formal hierarchy. 18 U.S.C. § 1961(4); *Turkette*, 452 U.S. at 583; Boyle, 556 U.S. at 946, 948. The entities' common purpose was to attract consumers with low representations, increase charges after custody, use household goods as leverage, and suppress claims. That objective is inferable from coordinated conduct. *Odom v. Microsoft Corp.*, 486 F.3d 541, 552–53 (9th Cir. 2007) (en banc).

Rice, Abrams, and Metz commonly owned and controlled the entities; personnel crossed company lines; and centralized systems governed marketing, sales, dispatch, claims, complaints, and records. SOF ¶¶ 1–2, 6–10, 12, 13–14. Years of transactions and continuing infrastructure supplied longevity independent of any shipment. Rotating names obscured recurring complaints while preserving centralized control. These facts establish Boyle's structural features and an enterprise distinct from, but capable of repeatedly committing, its predicates.

**B. Pattern of Racketeering Activity**

A pattern of racketeering requires related predicate acts that amount to or pose a threat of continued criminal activity. *H.J. Inc.,* 492 U.S. at 239.

Fries testified that she worked across numerous moving companies owned by Abrams, Metz, and Rice, all of which had overlapping staff and operational practices (Ex. 6, pp. 9–10, 29). Brickel's testimony further illuminates the fraudulent nature of these operations.

Brickel, whose practice had included deceptive-practices cases, defined a "bait-and-switch" as advertising one price and then raising it by the time the customer arrives (Ex. 10 at 6:10–14). The change in price typically occurred after the customers' goods had been loaded onto moving trucks, at which point they were told that unless they paid the increased amounts - often in cash - their goods would not be delivered. That practice satisfies mail fraud, 18 U.S.C. §

1341, and wire fraud, 18 U.S.C. § 1343. Binding estimates and contracts reached customers by mail and electronic communication, and the later demands for inflated charges by telephone and email, satisfying the use-of-mail and use-of-wire elements. A mailing need not itself be false or essential to the scheme; it suffices that the mailing is incident to an essential part of the scheme. Schmuck v. United States, 489 U.S. 705, 710–11 (1989). Related predicates of that kind, repeated over years, satisfy the pattern requirement. H.J. Inc., 492 U.S. at 239–42.

**C. <u>Non-Fraud Predicate Acts</u>**

The record also establishes non-fraud predicates: extortion under the Hobbs Act, 18 U.S.C. § 1951, theft from interstate shipments under 18 U.S.C. § 659, and interstate transportation of stolen property under 18 U.S.C. § 2314.

*See United States v. Tropiano,* 418 F.2d 1069, 1075–76 (2d Cir. 1969) (holding that "property" under the Hobbs Act includes the intangible right to conduct business free from wrongful coercion). Customers were repeatedly coerced into paying more than their binding estimates under threat of non-delivery. Withholding household goods unless the customer pays inflated charges is extortion through fear of economic loss under that standard. Tropiano, 418 F.2d at 1075–76.

Wrongful retention and disposal of customers' property constitutes theft from interstate shipments under § 659 and, when carried across state lines, interstate transportation of stolen property under § 2314. These predicates are distinct from the fraud predicates but integrally related: they were the means by which the enterprise enforced payment demands and profited from retained goods.

**D. <u>Continuity and Threat of Ongoing Activity</u>**

Closed-ended continuity is established by repeated bait-and-switch, extortion, and theft predicates over multiple years against consumers in several states. *Allwaste, Inc. v. Hecht*, 65

F.3d 1523, 1528–29 (9th Cir. 1995). Open-ended continuity also exists because common personnel, centralized records, controlled complaint responses, and successor names made the predicates a regular operating method that projected forward. *H.J. Inc*., 492 U.S. at 242; *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991).

Section 1962(d) prohibits agreements to violate RICO. A conspirator need only adopt the objective and agree to facilitate the endeavor, not perform every act. *Salinas v. United States,* 522 U.S. 52, 63-65 (1997). *Smith v. Berg,* 247 F.3d 532, 537-38 (3d Cir. 2001), likewise holds that a conspirator need not personally commit every predicate. Agreement may be inferred from coordinated conduct, interdependence, and mutual benefit. *Fernandez*, 388 F.3d at 1230.

Rice, Abrams, and Metz divided responsibility within the same enterprise: Abrams directed sales and deceptive estimates; Metz dispatch and physical operations; and Rice disputes, claims, records, and personnel including Brickel and Anthem. SOF ¶¶ 8–10, 12. Shared ownership, profits, staff, and complementary roles permit the inference that each knew of and facilitated the common scheme. *Oki Semiconductor Co. v. Wells Fargo Bank*, *National Association*, 298 F.3d 768, 775 (9th Cir. 2002). *Howard v. America Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000), states the awareness requirement, that a conspirator be "aware of the essential nature and scope of the enterprise and intended to participate in it"; the inference itself is carried by *Oki* at 775.

## IX. RICE'S KNOWING PARTICIPATION

Rice knowingly furthered enterprise objectives by retaining Brickel to negotiate post-loading "release" payments and by authorizing Anthem's systematic denial or delay of claims. SOF ¶¶ 9, 10, 19–22. Those decisions preserved proceeds derived from inflated charges and retained goods and show awareness of the enterprise's extortionate and fraudulent methods.

Although § 1962(d) requires no overt act, *Salinas*, 522 U.S. at 63–65, those acts prove the agreement's scope, and each advanced enterprise profit through racketeering.

### E. Scienter and Causation

Scienter requires knowledge of the scheme's essential nature and intent to further it, which may be inferred from circumstantial evidence and implementation of integral policies. *Fernandez*, 388 F.3d at 1228-30. Rice's knowledge rests not on title alone but on his and Abrams's management of U.S. Pro and Southeast Holding, Rice's appointment of Brickel, authorization of Anthem, approval of sensitive-record retention, and financial interest. SOF ¶¶ 2, 4, 6, 8–12, 14.

Brickel enforced inflated post-loading demands and threatened nondelivery under Rice's direction; Anthem denied or delayed resulting claims; and controlled DOT records could expose those practices. These aligned functions preserved revenue and shielded operations, establishing both knowledge and active advancement of fraud and extortion. Rice's personnel and records decisions, and Rice's and Abrams's claims decisions were calculated to enforce increased charges when customer goods supplied maximum leverage and to frustrate recovery afterward. SOF ¶¶ 9, 12, 19–21. Their alignment with the enterprise's profit model establishes intent, not incidental awareness. His salary, distributions, and other compensation supplied an additional economic incentive. SOF ¶¶ 2, 6, 8; *Fernandez*, 388 F.3d at 1228-30.

## X. CAUSATION: RICO'S PROXIMATE CAUSE OF PLAINTIFFS' INJURIES

Civil RICO requires but-for and proximate cause, but not first-party reliance when the scheme directly causes injury. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008), and the injury here satisfies even the stringent standard of *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). The Martis' overcharges, lost goods, and frustrated claims are injuries to business or property. *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118–19 (9th Cir. 2017); *Living*

*Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005); *Medical Marijuana, Inc. v. Horn,* 604 U.S. 593 (2025) (suggesting that under 18 U.S.C. § 1964(c) a plaintiff may seek treble damages for business or property loss even if the loss resulted from a personal injury). Enterprise representations induced the Martis to hire U.S. Pro; after loading, threatened nondelivery extracted increased payments, property disappeared or was damaged, and Anthem obstructed recovery. SOF ¶¶ 9, 10, 19–22. Those financial and property injuries were the foreseeable, intended, and direct results of the system Rice and Abrams helped operate.

### A. Proximate Cause Under Ninth Circuit Precedent

Proximate cause exists when racketeering necessarily and directly produces the injury without an intervening cause. Harmoni Int'l Spice, *Inc. v. Hume*, 914 F.3d 648, 651–52 (9th Cir. 2019). Rice's dispute and claims policies ensured payment, loss, or denied recovery; no independent event broke that chain. The Martis' losses were also the foreseeable and natural consequence of bait-and-switch pricing and claims suppression. *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co.,* 943 F.3d 1243, 1250-51 (9th Cir. 2019).

### B. The Directness of the Injury

The Supreme Court in *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992), identified the "directness" of the relationship between the conduct and the harm as the central inquiry in RICO proximate cause analysis. Rice's and Abrams's acts satisfy this test because the harm was the immediate result of their managerial decisions.

## XI. USE OF THE FLORIDA ATTORNEY GENERAL'S COMPLAINT AND CONSENT JUDGMENTS AS COMPETENT EVIDENCE

The Florida Attorney General's civil enforcement complaint may be considered on this motion.

Under Federal Rule of Evidence 803(8)(A)(iii), such records of a public office are admissible in a civil case when they set out factual findings from a legally authorized investigation, unless the opponent shows that the source of information or other circumstances indicate a lack of trustworthiness. Even if the complaint's form were challenged, its content is admissible under the Ninth Circuit's application of Federal Rule of Civil Procedure 56(c)(2). The Ninth Circuit holds that evidence need not be admissible in its present form at summary judgment so long as its content could be presented in admissible form at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003); JL Beverage Co., *LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016). SOF ¶¶ 13–16.

Beyond the complaint, Exs. 25–27, the subsequent consent final judgments, are public judicial records of the same court action. They permanently enjoin Rice, Metz, Abrams, SE Holding, US Pro, Gold Standard, and related entities from controlling the brokerage enterprise and impose non-confidential civil penalties and consumer relief totaling millions of dollars, including Ex. 26B, $1,500,000 in civil penalties under Fla. Stat. § 501.2075 against the Abrams Defendants jointly and severally. Those judgments are offered as public-record evidence of dual control, common enterprise, and control-based relationships among SE Holding, US Pro, Gold Standard, and the individual managing members; they are not offered as issue-preclusive adjudications of every RICO element in this action.

## SECTION B. STATE CLAIMS

## XII. NEGLIGENT SELECTION, HIRING, AND RETENTION

### A. The Governing Law in Each Interested State Supports the Claim

The negligent-selection claim is not an afterthought to the cargo dispute. It addresses Southeast Holding's own antecedent decision to entrust an Oregon consumer's household to D United despite information identifying D United as unfit, and Southeast Holding's continuing

decision to retain that carrier after the danger became unmistakable. The claim therefore rests on Southeast Holding's independent duty of reasonable selection and supervision, not on a promise in the bill of lading. California federal law recognizes that an employer may be liable to a third person for negligently hiring or retaining an incompetent or unfit actor, and that duty arises when there is a qualifying relationship and foreseeable injury. *Dent v. National Football League*, 902 F.3d 1109, 1121-22 (9th Cir. 2018).

Oregon federal authority likewise frames negligence around a foreseeable risk, unreasonable conduct, causation, and injury to the plaintiff or a protected class. *Oki Semiconductor*, 298 F.3d 768. The precise sequence need not be foretold when the generalized kind of harm was predictable. *Senger v. United States*, 103 F.3d 1437, 1441–43 (9th Cir. 1996). Florida reaches the same practical result for an independent contractor: the contractor was incompetent or unfit, the hiring party knew or reasonably should have known it, and that unfitness proximately caused the injury. *Davies v. Commercial Metals Co.,* 46 So. 3d 71 (Fla. Dist. Ct. App. 2010). Thus the claim survives under California, Oregon, or Florida law; any choice-of-law difference affects verbal formulation, not the outcome on this record.

### B. <u>The Undisputed Record Establishes Knowledge, Breach, and Causation</u>

The summary-judgment record permits only one reasonable conclusion on notice and breach. Southeast Holding's managers repeatedly placed consumer shipments with D United and controlled the enterprise's carrier-selection function. The available information included public Department of Transportation complaint data, consumer reports, prior hostage-load allegations, and the escalating circumstances of this shipment. Yet the enterprise's admitted vetting stopped at registration and insurance rather than testing whether D United could be trusted with access to a family's home, valuables, and leverage over delivery. SOF ¶¶ 9, 19. A reasonable selector does not ignore the sources that reveal whether a carrier uses price escalation, retention of goods, or

intimidation as operating methods. Once the Martis reported threats, unexplained charges, and retention, Southeast Holding had a separate retention duty: suspend D United, secure the goods, require an inventory, preserve evidence, and arrange safe delivery.

Instead, the same actors and claims machinery protected the arrangement and left D United in control. That is breach as a matter of law because no countervailing evidence identifies a genuine safety investigation or corrective action.

Causation is equally direct. D United's alleged unfitness was not an unrelated defect; it was the exact danger reasonable screening would have exposed. The goods were withheld, police presence became necessary, threats and extortionate demands were made, and the Martis suffered anxiety, sleeplessness, disrupted nutrition, and severe emotional distress. The watch was removed from the safe while other property was retained or damaged. 4AC ¶¶ 233–240; SOF ¶¶ 22–27. Unlike *Davies*, 46 So. 3d at 73-74, where the alleged deficiency did not cause the accident, D United's propensity for hostage tactics and mishandling is the mechanism that produced these injuries. Nor may Southeast Holding escape because D United was labeled an independent contractor. The claim exists precisely to impose liability for the selector's own negligence where ordinary respondeat superior may not apply.

At minimum, the undisputed warnings and the realized, matching danger establish the constituent facts under Federal Rule of Civil Procedure 56(g); the amount of noneconomic damages may be reserved for trial without denying liability adjudication.

### C. Neither FAAAA Nor Carmack Erases the Independent Personal-Injury Claim

FAAAA does not require dismissal. The statute reaches a state law only when it relates to a broker's price, route, or service "with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). The Supreme Court treats that final phrase as a material limitation: post-movement storage or disposal is outside the preemption provision when it no longer relates to movement.

*Dan's City Used Cars, Inc. v. Pelkey,* 569 U.S. 251, 261 (2013). Here, substantial misconduct occurred after the watch had been separated from the shipment and while furniture was held at the warehouse rather than moving to destination. More importantly, the claim seeks redress for threats, unsafe human conduct, police intervention, and personal injury, not merely a different economic rule for selecting a carrier. The safety exception preserves state safety regulatory authority "with respect to motor vehicles." 49 U.S.C. § 14501(c)(2)(A).

The Ninth Circuit therefore allows common-law negligent-selection claims having the required direct connection to motor-vehicle safety and personal injury. Miller v. C.H. Robinson Worldwide, Inc., 976 F.3d 1016, 1026 (9th Cir. 2020). That reasoning should extend to the safety of household-goods consumers confronted by carrier personnel exercising physical custody and coercive control during a motor-carrier transaction. The Supreme Court has since resolved the question directly. In *Montgomery v. Caribe Transport II, LLC*, 608 U.S. 219, 146 S. Ct. 1199 (2026), the Court held that a negligent-hiring claim against a transportation broker "falls within the FAAAA's safety exception, which saves it from preemption," and explained that the exception "saves only a subset of preempted claims: those involving regulations concerning motor vehicle safety." The Court listed *Miller*, 976 F.3d at 1020, among the decisions on the side of the Circuit split it adopted.

Southeast Holding will likely rely on *Aspen American Insurance Co. v. Landstar Ranger, Inc.,* 65 F.4th 1261, 1264 (11th Cir. 2023*),* which Montgomery named on the losing side of the Circuit split it resolved, but Aspen involved commercial cargo misdelivered to a fraudulent actor and sought only cargo loss. The Eleventh Circuit found no direct motor-vehicle safety connection on that pleading. This case alleges the missing connection: carrier fitness, household access, threats, police presence, and personal injury arising from the carrier personnel and

vehicle-centered custody selected by Southeast Holding. Even if the Court reads Aspen broadly as to the $22,731 cargo component, it should sever rather than extinguish the distinct personal-injury component and enter Rule 56(g) findings on negligent selection. Carmack is narrower still.

It supplies the exclusive cargo remedy for loss, delay, and delivery-related damage by a carrier, but it does not transform an upstream broker's independent negligent-selection duty or separate personal injury into "actual loss or injury to the property." Plaintiffs recover property loss and independently caused personal injury under state law without double recovery. The Court should grant liability summary judgment on negligent selection, hiring, and retention and reserve only the measure and allocation of damages.

## XIII. CONVERSION

### A. The Undisputed Facts Establish Conversion Under Oregon, California, or Florida Law

Conversion focuses on wrongful dominion, not the label placed on the transaction. Oregon, California, and Florida each treat unauthorized dominion that deprives the owner of control as conversion. *Thompson v. Inman,* No. 6:22-cv-01665 (D. Or. May 9, 2024); *Bank of New York v. Fremont General Corp.,* 523 F.3d 902, 914 (9th Cir. 2008); *Senfeld v. Bank of Nova Scotia Trust Co.,* 450 So. 2d 1157, 1160-61 (Fla. Dist. Ct. App. 1984).

Those formulations converge here.

The Martis owned and had an immediate right to possess the watch, chair, ottoman, and dolly. The watch was removed from the safe at the warehouse while the safe itself continued through the claimed transportation chain; the watch did not. The chair, ottoman, and dolly were acknowledged to be in D United's possession on December 24, 2020, then were neither delivered nor returned. 4AC ¶¶ 241–249; SOF ¶¶ 22, 24. No bailment, tariff, estimate, or bill of lading

authorized permanent retention, removal from a closed safe, concealment, disposal, or use as leverage for disputed charges. Repeated demands and the indefinite failure to return eliminate any benign inference. Under Thompson, ECF No. 87, documentary admissions and communications proving control over missing property can support summary judgment on conversion liability even while property value and emotional-distress amounts remain for the factfinder.

The same division is appropriate here: liability and the historical facts are adjudicable now; disputed valuation, if any, can be tried.

### B. Carmack and FAAAA Do Not Bar the Narrow Conversion Theory; Alternatively, the Facts Defeat Any Liability Limitation

Plaintiffs acknowledge the adverse rule and define the claim narrowly. *Hall v. North American Van Lines, Inc.,* 476 F.3d 683, 688, 689-90 (9th Cir. 2007), holds that Carmack is exclusive for contract claims alleging delay, loss, failed delivery, or property damage and bars fraud or conversion theories arising from a carrier's delivery obligations. A Florida federal court similarly applied Carmack to conversion and theft allegations concerning an in-transit package. *Mtelehealth, LLC v. United Parcel Service, Inc.,* 441 F. Supp. 3d 1312, 1318-19 (S.D. Fla. 2019). But both authorities concern property accepted and retained within the asserted transportation service. The watch here was removed from a safe and ceased moving with the shipment; the furniture was acknowledged in warehouse possession and then held indefinitely. Under *Dan's City*, 569 U.S. at 261, storage and handling count as "transportation" only while related to movement. 49 U.S.C. § 13102(23)(B). Permanent appropriation and post-transport disposal are outside that boundary. The claim also targets Southeast Holding as broker/controller, while Carmack imposes cargo liability on receiving, delivering, and line-haul carriers. 49 U.S.C.

§ 14706(a). Carmack's cargo-liability framework does not preclude this conversion claim against Southeast Holding as broker/controller.

At minimum, the same facts have decisive federal consequences even if the Court channels the remedy through Carmack. The Ninth Circuit recognizes “true conversion” where the carrier has appropriated the property for its own use or gain; public policy then forbids the carrier from profiting through a contractual limitation of liability. *Glickfeld v. Howard Van Lines, Inc.,* 213 F.2d 723, 727 (9th Cir. 1954). Plaintiffs’ evidence, the watch separated from the safe, specifically identified furniture acknowledged and never returned, prolonged refusal, and an enterprise designed to retain proceeds while insulating the custodial actor, permits that finding. If the Court deems the state remedy preempted, it should not dismiss the proven wrong as legally irrelevant.

It should enter Rule 56(g) findings establishing the conversion facts, hold that any released-value limitation is unavailable upon proof of appropriation for Southeast Holding’s or the enterprise’s use or gain, and reserve the federal measure of damages. Either route gives effect to federal uniformity without granting a licensed moving enterprise immunity for intentional appropriation after transportation ended.

## XIV. CONCLUSION AND PRAYER

Plaintiffs request that the Court GRANT summary judgment against Southeast Holding LLC and enter judgment: (a) Count III, $68,193.00 in treble RICO damages plus attorney's fees under 18 U.S.C. § 1964(c); (b) State Count I, $22,731.00 in transaction and property loss plus $50,000.00 in emotional-distress damages; (c) partial summary judgment, or alternatively a Rule 56(g) order, establishing that Southeast Holding lacked a bona fide independent operating existence in the moving-broker enterprise and was used as the controlled instrumentality for concealment, statutory evasion, and the pleaded RICO scheme, without imposing personal

money liability on an absent or dismissed shareholder; (d) costs of suit; and (e) such other relief as the Court deems just. Plaintiffs request liability on every established claim and acknowledge that overlapping compensatory amounts should be allocated at final judgment to prevent duplicative recovery, not used to deny liability.

DATED: September 11, 2026

Respectfully submitted,

*/s/ Thad M. Guyer*

Thad M. Guyer (OSB 821443)
T.M. Guyer and Ayers & Friends, PC
116 Mistletoe Street
Medford, OR 97501
Telephone: (202) 227-3590
thad@guyerayers.com

Attorneys for Plaintiffs

**CERTIFICATE OF COMPLIANCE**

This combined Motion, Statement of Undisputed Material Facts, and Memorandum of Law contains 10,923 words, including headings, footnotes, and quotations, and excluding the caption, table of contents, table of authorities, certificate of conferring with adverse counsel, signature blocks, exhibits, and certificates of counsel. The filing therefore complies with the 11,000-word limit of D. Or. LR 7-2(b)(1).

*/s/ Thad M. Guyer*
Thad M. Guyer

**CERTIFICATE OF SERVICE**

I hereby certify that on September 11, 2026, I electronically filed the foregoing Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment Against Defendant Southeast Holding LLC with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record who are registered CM/ECF users. I further certify that Defendant Southeast Holding LLC is currently unrepresented by counsel of record; the clerk of court shall send a true and correct copy of the foregoing on Southeast Holding LLC by first-class mail, postage prepaid, at its last known address of record in this action. I also certify that I have served a copy by email on counsel for defendants Rice and Abrams, both of whom are owners of the defendant Southeast Holding, LLC, and on Mr. Rice's counsel of record.

*/s/ Thad M. Guyer*
Thad M. Guyer